**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **FELICIA ASHAMI QUARCOO,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. DLB-25-2484** |
| **JOSEPH B. EDLOW,** ***in his official capacity as Director, U.S. Citizenship & Immigration Services*****,** | * | |
| | * | |
| **Defendant.** | * | |

## MEMORANDUM OPINION

Felicia Ashami Quarcoo, a U.S. citizen, wants to adopt A.A., a Ghanaian child. Quarcoo sought a visa on A.A.'s behalf so that A.A. could join her in the United States. The visa process for intercountry adoptees like A.A. is governed by the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption ("Hague Convention") and its implementing statutes and regulations. As one step in this process, a prospective adoptive parent ("PAP") must file a Form I-800 Petition to Classify Convention Adoptee as an Immediate Relative ("Form I-800") with U.S. Citizenship and Immigration Services ("USCIS"). Then, if USCIS provisionally approves the Form I-800, the Form I-800 is forwarded as a visa petition to the State Department for final approval.

Quarcoo filed a Form I-800 on A.A.'s behalf. But USCIS denied her petition, citing discrepancies in the record regarding A.A.'s parentage and chain of custody. In this lawsuit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, Quarcoo claims that USCIS's decision was arbitrary, capricious, and contrary to law. USCIS has filed a motion to dismiss, arguing that Quarcoo's claims are barred by the doctrine of consular nonreviewability and that even if they are not, Quarcoo nevertheless fails to state a claim upon which relief can be granted.

USCIS also has filed a motion to seal the administrative record. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the following reasons, USCIS's motion to dismiss and its motion to seal are denied.

## I. Background

### A. The Hague Convention Adoption Process

The Hague Convention is an international treaty regarding intercountry adoptions. *See* Hague Convention, May 29, 1993, S. Treaty Doc. No. 105-51, 1870 U.N.T.S. 167. The United States signed the Hague Convention in 1994, and after a ratification process spanning more than a decade, the Hague Convention finally entered into force in the United States on April 1, 2008. *See* Deposit of Instrument of Ratification by the United States of the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption, 72 Fed. Reg. 71,730 (Dec. 18, 2007). Ghana also is a party to the Hague Convention, which entered into force there on January 1, 2017. *See Ghana Intercountry Adoption Information*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/Intercountry-Adoption/Intercountry-Adoption-Country-Information/Ghana.html [https://perma.cc/5T4Z-KPTC] (last visited Aug. 25, 2026).

The Hague Convention was intended "to establish safeguards to ensure that intercountry adoptions take place in the best interests of the child," "to secure the recognition in Contracting States of adoptions made in accordance with the Convention," Hague Convention, *supra*, art. 1, and to "prevent the abduction, the sale of, or traffic in children," *id.* pmbl. To that end, parties to the Hague Convention agree to abide by certain substantive and procedural requirements in connection with intercountry adoptions. Specifically, "[a]n adoption within the scope of the [Hague] Convention" may not take place unless the "competent authorities" of the child's country of origin establish (among other things) that the adoption would be in the child's best interests and

that necessary consents have been freely and intelligently given. *Id.* art. 4. Likewise, the "competent authorities" in the country where the PAPs reside also must ensure that the PAPs "are eligible and suited to adopt," that they "have been counselled as may be necessary," and that "the child is or will be authorized to enter and reside permanently in that State." *Id.* art. 5. In reaching these determinations, the authorities in the child's and the PAP's countries must exchange detailed information regarding, among other things, the PAP's background, family and medical history, social environment, and reasons and suitability for adoption, and the child's background, family and medical history, social environment, and special needs. *Id.* arts. 15–16. Once all necessary approvals are secured, the authorities in both countries "shall take all necessary steps to obtain permission for the child to leave the State of origin and to enter and reside permanently in the receiving State." *Id.* art. 18.

To implement the Hague Convention, Congress passed, and the President signed, the Intercountry Adoption Act of 2000 ("IAA"), Pub. L. No. 106-279, 114 Stat. 825, which is codified at 42 U.S.C. § 14901 *et seq*. The IAA, among other things, amended the Immigration and Nationality Act ("INA"). Generally, under the INA, a U.S. citizen who wishes to sponsor her noncitizen "child[], spouse[], [or] parent[]" for an immigrant visa may file a petition with USCIS—which is housed in the Department of Homeland Security ("DHS")—to classify that individual as an "immediate relative." 8 U.S.C. §§ 1151(b)(2)(A)(i), 1154(a)(1)(A)(i); *see also* 6 U.S.C. § 271(b)(1) (delegating to USCIS the authority to adjudicate immigrant visa petitions).[1] If, "[a]fter an investigation of the facts," USCIS approves the petition, the child, spouse, or parent in question

[1] Generally, visas fall into two categories: "nonimmigrant" visas that allow noncitizens "to visit the United States on a temporary basis" for purposes such as "tourism, business, [or] study" and "immigrant" visas that authorize noncitizens to live permanently in the United States. *E.g.*, *Punt v. U.S. Citizenship & Immigr. Servs.*, No. 22-1218 (RC), 2023 WL 157320, at *1 (D.D.C. Jan. 11, 2023).

then may apply to the State Department for an immigrant visa. 8 U.S.C. § 1154(b). To qualify as a "child" for purposes of immediate-relative status under the INA, an individual must be unmarried, be less than 21 years old, and—depending on her circumstances—satisfy certain other requirements. 8 U.S.C. § 1101(b)(1).

The IAA updated the INA's statutory definition of a "child." Following the passage of the IAA, an unmarried person under the age of 21 may qualify as a "child," and thus be eligible for an immigrant visa, if they are:

> (i) a child, younger than 16 years of age at the time a petition is filed on the child's behalf to accord a classification as an immediate relative under section 1151(b) of this title, who has been adopted in a foreign state that is a party to the Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption, done at The Hague on May 29, 1993, or who is emigrating from such a foreign state to be adopted in the United States by a United States citizen and spouse jointly or by an unmarried United States citizen who is at least 25 years of age, Provided, That—
>
> > (I) the Secretary of Homeland Security is satisfied that proper care will be furnished the child if admitted to the United States;
> >
> > (II) the child's natural parents (or parent, in the case of a child who has one sole or surviving parent because of the death or disappearance of, abandonment or desertion by, the other parent), or other persons or institutions that retain legal custody of the child, have freely given their written irrevocable consent to the termination of their legal relationship with the child, and to the child's emigration and adoption;
> >
> > (III) in the case of a child having two living natural parents, the natural parents are incapable of providing proper care for the child;
> >
> > (IV) the Secretary of Homeland Security is satisfied that the purpose of the adoption is to form a bona fide parent-child relationship, and the parent-child relationship of the child and the natural parents has been terminated (and in carrying out both obligations under this subclause the Secretary of Homeland Security may consider whether there is a petition pending to confer immigrant status on one or both of such natural parents); and
> >
> > (V) in the case of a child who has not been adopted—

> (aa) the competent authority of the foreign state has approved the child's emigration to the United States for the purpose of adoption by the prospective adoptive parent or parents; and
>
> (bb) the prospective adoptive parent or parents has or have complied with any pre-adoption requirements of the child's proposed residence; and
>
> (ii) except that no natural parent or prior adoptive parent of any such child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter[.]

8 U.S.C. § 1101(b)(1)(G). The IAA also added a requirement that "no petition" for immediate-relative status "may be approved on behalf of a child defined in [§] 1101(b)(1)(G)" unless "a United States citizen habitually resident in the United States has effected final adoption of the child, or has been granted custody of the child for the purpose of emigration and adoption, in accordance with [the Hague Convention] and [the IAA]." 8 U.S.C. § 1154(d)(2).

USCIS eventually promulgated regulations to implement the IAA. These regulations, among other things, "govern[] the adjudication" of immigrant visa petitions for "Convention adoptee[s]," 8 C.F.R. § 204.300(a), defined as "child[ren] habitually resident in a [Hague] Convention country who [are] eligible to immigrate to the United States on the basis of a Convention adoption," *id.* § 204.301. A "Convention adoption," in turn, is defined as an "adoption, on or after the [Hague] Convention effective date, of an alien child habitually resident in a Convention country by a U.S. citizen habitually resident in the United States, when in connection with the adoption the child has moved, or will move, from the Convention country to the United States." *Id.* § 204.301. Pursuant to the regulations, a PAP can file a visa petition with USCIS to classify a child who is residing in a foreign country, and whom the PAP wishes to adopt, as the PAP's "child" (and thus as an "immediate relative" eligible for an immigrant visa) under § 1101(b)(1)(G). *Id.* § 204.306.

The process works like this. First, the PAP files a Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country ("Form I-800A") with USCIS. *Id.* § 204.306(b)(1). The Form I-800A asks PAPs detailed questions about topics such as their criminal and child-protective histories, previous marriages, spouses, and immigration status; PAPs also must submit a home study. *See Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country*, USCIS, https://www.uscis.gov/sites/default/files/document/forms/i-800a.pdf [https://perma.cc/DNC8-9Y2W] (last visited Aug. 25, 2026).

Next, if USCIS approves the Form I-800A and certain other requirements are met, the PAP may file a visa petition—the Form I-800—with USCIS. 8 C.F.R. §§ 204.306(b)(2), 204.313(a); *see also id.* § 204.308(b) (specifying that a petitioner may file a Form I-800 either with USCIS or with "a visa-issuing post that would have jurisdiction to adjudicate a visa application filed by or on behalf of the Convention adoptee," depending on "the instructions that accompany Form I-800"); *Form I-800, Petition to Classify Convention Adoptee as an Immediate Relative*, USCIS, https://www.uscis.gov/i-800 [https://perma.cc/4E9Z-AJ2E] (last visited Aug. 25, 2026) (directing petitioners to file Forms I-800 with USCIS). Preparing and filing a Form I-800 is no simple task. The petitioner must submit voluminous evidence, including a report from the authorities in the child's home country verifying that necessary consents have been obtained, that the child is eligible for adoption, and that adoption would be in the child's best interests; a summary of the child's medical and social history; a copy of the child's birth certificate; and information about the adoption service provider's "plan for post-placement duties." 8 C.F.R. § 204.313(d). Following an investigation, the USCIS officer adjudicating the Form I-800 must determine whether the child qualifies as a "child" for immediate-relative purposes under § 1101(b)(1)(G) and whether "the

proposed adoption or grant of custody will meet [Hague] Convention requirements." *Id.* § 204.313(f)–(g). The USCIS officer may deny the Form I-800, in which case the officer must issue a written decision explaining the reasons for the denial and notifying the PAP "of [any] right to appeal . . . as specified in 8 C.F.R. [§] 204.314." *Id.* § 204.313(i). But if the USCIS officer concludes that the child likely qualifies as a "child" under § 1101(b)(1)(G) and the child's adoption will satisfy Hague Convention requirements, the officer will "provisionally approve" the Form I-800. *Id.* § 204.313(g)(1).

Once the Form I-800 is provisionally approved, the State Department steps in. If the child intends to apply for a visa, the USCIS officer forwards the Form I-800, notice of provisional approval, and supporting evidence to the State Department. *Id.* § 204.313(g)(2). The State Department then decides whether to "final[ly] approv[e]" the Form I-800. *Id.* § 204.313(h)(1). The PAP must submit documents pertaining to the child's adoption, such as adoption decrees. *Id.* If, upon review of this evidence, the Secretary of State certifies that the authorities in the child's country of origin have "notified the United States central authority under the [Hague Convention] . . . that a United States citizen habitually resident in the United States has effected final adoption of the child, or has been granted custody of the child for the purpose of emigration and adoption," 8 U.S.C. § 1154(d)(2), then the State Department officer "who has jurisdiction over the child's visa application has authority, on behalf of USCIS, to grant final approval of a Form I-800," 8 C.F.R. § 204.313(h)(2). The child then may receive an immigrant visa from the State Department. *See Who Can Be Adopted*, U.S. Dep't of State, http://travel.state.gov/content/travel/en/Intercountry-Adoption/Adoption-Process/before-you-adopt/who-can-be-adopted.html [https://perma.cc/PL7X-TKM6] (last visited Aug. 25, 2026) ("Generally, if the consular officer determines that the adoption was completed in accordance with the laws of the child's country of origin and with [Hague]

Convention requirements . . . the consular officer will issue final approval of the Form I-800 petition . . . and an immigrant visa to the child.”).

**B. Quarcoo’s Allegations**

The following allegations from Quarcoo’s complaint are assumed to be true for purposes of the pending motion to dismiss.

A.A. is a Ghanaian child. ECF 1, ¶ 44. Ghana formally joined the Hague Convention in 2017. *Id.* ¶ 47. While Ghana went through the process of joining the Hague Convention, “the United States and Ghana paused all intercountry adoptions.” *Id.*

In December 2016, A.A.’s biological mother abandoned her at the Nsawam Government Hospital in Ghana. *Id.* ¶ 44. The hospital notified Ghana’s Department of Social Welfare (“DSW”), which granted custody of A.A. to Jane Abena Aggrey, Quarcoo’s daughter. *Id.* ¶¶ 45–46. A.A. was five weeks old at the time. *Id.* at 2. Aggrey decided to adopt A.A. *Id.* ¶ 48.

When the DSW granted Aggrey custody of A.A., Aggrey was temporarily in Ghana; she lived and worked in New Jersey. *Id.* at 2; *id.* ¶ 51. Quarcoo lived in Silver Spring, Maryland and was a lawful permanent resident of the United States. *Id.* ¶ 49. Quarcoo’s family had a “family home” in Kwabenya, Ghana. *Id.* Quarcoo’s sister, Charity Agyarko-Sarpong, lived in Ghana. *Id.* at 2.

Aggrey eventually “returned to New Jersey and pursued the steps for an intercountry adoption under the Hague Convention.” *Id.* ¶ 48. While Aggrey pursued A.A.’s adoption in the United States, Quarcoo left her home in Silver Spring and traveled to Ghana to care for A.A. at the family home in Kwabenya. *Id.* ¶ 49. Quarcoo lived with and cared for A.A. in Ghana for approximately two years. *Id.* ¶ 50. Meanwhile, Aggrey visited A.A. in Ghana, taking “months of leave” from her job to do so. *Id.* ¶ 51.

The onset of the COVID-19 pandemic "caused the United States and Ghana to shut down most daily activities and travel." *Id.* ¶ 52. In April 2020, Aggrey unexpectedly passed away in West Orange, New Jersey. *Id.* ¶¶ 53–54. The following month, Quarcoo returned to the United States, leaving A.A. in the care of her sister, Agyarko-Sarpong. *Id.* ¶¶ 55–56. Quarcoo continued to pay for A.A.'s "financial needs, including her education costs, clothing, and general welfare." *Id.* ¶ 63.

At some point, Quarcoo "learned that she could adopt A.A." herself "and petition for an immigrant visa, but only if [] Quarcoo first became a United States citizen." *Id.* ¶ 57. So, Quarcoo decided to naturalize. *Id.* ¶ 58. In conjunction with her naturalization application, Quarcoo submitted a Ghanaian "Register of Births" (essentially a birth certificate) dated February 25, 2021 that identified A.A.'s parents as Aggrey and a man named Kofi Adom. *Id.* ¶ 59. Quarcoo became a U.S. citizen in July 2022. *Id.* ¶ 58.

Once Quarcoo became a citizen, she sought to adopt A.A. and secure a visa for A.A. to come to the United States. *Id.* ¶ 60. Quarcoo filed a Form I-800A, which USCIS approved. *Id.* ¶ 61.

Several legal developments then occurred in Ghana. On March 22, 2023, the Superior High Court of Judicature in the High Court of Justice ordered that A.A. be placed in the care of the DSW and granted the DSW "legal authority to exercise parental rights over A.A." *Id.* ¶ 64. Then, on July 18, 2023, Ghana issued a Register of Births for A.A. that identified A.A.'s biological mother as a woman named Mary Dankwah. *Id.* ¶ 65. This Register of Births, unlike the 2021 Register of Births that Quarcoo had submitted with her naturalization application, did not identify Aggrey or Kofi Adom as A.A.'s parents. *Id.* ¶ 66.

Next, in August 2023, Ghana's Central Adoption Authority ("CAA") issued a "Child Study Report" for A.A. *Id.* ¶ 67. This report "identified A.A.'s chain of custody in Ghana and found A.A.

to be an orphan eligible for adoption." *Id.* On August 15, 2023, the CAA issued several additional documents, including a "Declaration of Adoption," *id.* ¶ 68, that "granted [Quarcoo] clearance to proceed with the process to adopt A.A." under the Hague Convention, *id.* ¶ 70. Around this time, the DSW also "provided irrevocable consent to transfer legal custody" of A.A. to Quarcoo. *Id.* ¶ 69.

On August 31, 2023, Quarcoo filed a Form I-800 visa petition with USCIS for preliminary approval. *Id.* ¶ 71. Among other evidence, she attached the Child Study Report and documents issued by the CAA; A.A.'s medical history; the High Court of Justice's March 22, 2023 Order; a copy of a "police extract" from the Ghana Police; documents from A Family in Bloom, an adoption services agency; a copy of Aggrey's death certificate issued by the New Jersey Department of Health; and a birth certificate for A.A. that identified her biological mother as Mary Dankwah. *Id.*; *see also* ECF 1-1, at 1–2 (USCIS Notice of Decision listing evidence submitted with Form I-800).

On January 3, 2024, USCIS issued a Notice of Intent to Deny ("NOID") Quarcoo's Form I-800. ECF 1, ¶ 72. USCIS requested several additional pieces of documentation: a "clear copy" of Aggrey's death certificate; evidence of A.A.'s chain of custody; A.A.'s birth certificate or secondary evidence of her birth; the irrevocable consent of Kofi Adom, who had been listed on the 2021 Register of Births as A.A.'s biological father, to her adoption; and A.A.'s medical and social history. *Id.* ¶ 73; *see also* ECF 1-1, at 2.

Quarcoo responded to the NOID on February 6, 2024. ECF 1, ¶ 74. She submitted several documents with her response. She resubmitted a copy of Aggrey's death certificate and submitted copies of CAA documentation that "outlin[ed] A.A.'s age and identity, the placement of A.A. into the care of the DSW, and the DSW's irrevocable consent to A.A.'s adoption"; a "sworn document . . . and the records from Ghana regarding the abandonment, medical care of A.A., and

investigation of A.A.'s natural parents"; and sworn statements from herself and Agyarko-Sarpong regarding A.A.'s care and custody. *Id.* ¶¶ 80–83. In addition, she submitted a letter written by Stephen Dombo, a CAA employee, purporting to explain why the 2021 Register of Births listed Kofi Adom as A.A.'s father. *Id.* ¶ 84. In his letter, Dombo wrote:

> The DSW has explained that during the data entry stage of the birth certificate application, there was a misunderstanding at the Registry, resulting in Kofi Adom's name being mistakenly included as the father of the child. Notably, the DSW has stated they have no knowledge of any individual named Kofi Adom, and there is no record of mentioning him from the time the child was found. Furthermore, the inclusion of Jane Aggrey's name as the child's mother occurred because [Quarcoo] was in the process of completing the adoption.

ECF 1-1, at 3 (cleaned up). Finally, Quarcoo also submitted a legal brief prepared by her attorney, Nicole Skellenger, in which she argued that USCIS was violating the Hague Convention and the regulations by not cooperating with the Ghanaian government and by not deferring to its findings regarding A.A.'s eligibility for adoption. ECF 1, ¶¶ 75–79.

On May 7, 2024, USCIS issued a Notice of Decision denying Quarcoo's Form I-800. *Id.* ¶ 86. USCIS concluded that Quarcoo had "provided insufficient evidence to establish that [A.A.] meets the definition of a Convention Adoptee." ECF 1-1, at 1. It gave three reasons for its decision. First, USCIS concluded that Quarcoo had not provided sufficient or plausible evidence regarding the circumstances of A.A.'s birth and parentage. USCIS was troubled by Kofi Adom's appearance on A.A.'s 2021 Register of Births and was unsatisfied with Dombo's explanation that this discrepancy was the result of a "misunderstanding at the Registry." *Id.* at 3. USCIS reasoned that Dombo's explanation was implausible and observed that if Quarcoo was "aware of the discrep[a]ncy on the birth certificate when [she] provided [it] in 2021" in connection with her naturalization application, then it was "unclear" why she nonetheless "submitted [it] to USCIS as a factual birth certificate." *Id.* USCIS also stated that it was "unclear why a misunderstanding at

the Registry would result in an unknown man being listed on the birth certificate of a child and then subsequently submitted to USCIS as a true and accurate piece of evidence." *Id.* Further, USCIS noted, the secondary evidence Quarcoo had submitted of A.A.'s birth did "not contain information on who the biological parents of [A.A.] are," leaving USCIS unable to "determine the relevance of Kofi Adom." *Id.* at 4.

Second, USCIS stated that Quarcoo had not provided sufficient evidence that Aggrey—the person Quarcoo asserted was the child's previous legal custodian—actually had died. USCIS explained that the copy of the death certificate for Aggrey that Quarcoo had submitted with her Form I-800 had not been "clear" and that in response to USCIS's request in the NOID for a "clear copy," Quarcoo had submitted the same unclear copy she had submitted previously. *Id.* Thus, USCIS concluded, "there is insufficient evidence to establish the death of Jane Aggrey." *Id.*

Third, USCIS stated that it was unable to determine A.A.'s chain of custody. It determined that Quarcoo had not provided "evidence of the transfer of custody of the child from her birth, to the adoption by Jane Aggrey, to Jane Aggrey's death, to [Quarcoo's] potential adoption of the child." *Id.* It also noted that although Aggrey "passed away of an illness in 2020 in the United States," A.A. did not "appear to have ever left Ghana," so it was "unclear who had care and custody of the child when Jane Aggrey, the person [Quarcoo] claim[s] was the legal custodian of the child, was in the United States" and that it also was "not clear who maintained legal custody of [A.A.] from the time Jane Aggrey passed away to now." *Id.*

Because USCIS denied Quarcoo's visa petition, Quarcoo has been unable to move on to the next step and obtain a visa for A.A. from the State Department.

### C. Procedural History

On July 9, 2024, Quarcoo filed this lawsuit against USCIS in the U.S. District Court for the District of Colorado, challenging the denial of her Form I-800.[2] ECF 1. On April 18, 2025, the parties filed a joint motion to transfer the case to this district, which is where Quarcoo resides and USCIS is headquartered. ECF 17. The Colorado court granted that motion and transferred the case here on June 25, 2025. ECF 18.

Quarcoo brings three APA claims.

In Count I, Quarcoo claims that USCIS acted arbitrarily, capriciously, and contrary to law by requiring that A.A.'s natural parents consent to A.A.'s adoption, since the DSW, which had legal custody of A.A., had provided its irrevocable consent to A.A.'s adoption. In requiring the consent of A.A.'s biological parents, Quarcoo claims, USCIS disregarded 8 U.S.C. § 1101(b)(1)(G)(i)(II), which states that an intercountry adoptee may qualify as a "child" eligible for an immigrant visa if *either* her natural parents *or* "other persons or institutions that retain legal custody of the child" have consented to the child's emigration and adoption. *Id.* ¶¶ 97–119.

In Count II, Quarcoo argues that USCIS acted arbitrarily, capriciously, and contrary to law by ignoring documents from the CAA and the Ghanaian courts that established the propriety of Quarcoo's efforts to adopt A.A. and by failing to consider her and Agyarko-Sarpong's testimony regarding A.A.'s care and custody. *Id.* ¶¶ 120–34.

In Count III, Quarcoo argues that USCIS acted arbitrarily, capriciously, and contrary to law by disregarding her and Agyarko-Sarpong's testimony, "ignor[ing] or improperly substitut[ing] its judgment for the judgment of the [CAA]," and "engag[ing] in speculation and suspicion without

---

[2] Quarcoo filed her lawsuit against the Director of USCIS in her (now his) official capacity. Because an official-capacity suit is tantamount to a suit against the entity itself, the Court refers to the defendant as "USCIS."

regard to the judicial transfer of parental rights to DSW and the [CAA]'s satisfaction that A.A. was eligible for adoption" under the Hague Convention and Ghanaian law. *Id.* ¶¶ 135–45.

Quarcoo requests that the Court declare unlawful and set aside USCIS's decision denying her Form I-800. *Id.* at 25 ¶ B (prayer for relief).

After this case was transferred to the District of Maryland, the Court ordered USCIS to file the certified administrative record. ECF 27. USCIS filed the administrative record and an unopposed motion to seal it. ECF 29 (mot. to seal); ECF 30 (notice of filing under seal).[3]

---

[3] The Court cannot grant the motion to seal merely because it is unopposed. *See, e.g.*, *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins.*, 178 F.3d 943, 945 (7th Cir. 1999) ("The judge is the primary representative of the public interest in the judicial process and is duty-bound therefore to review any request to seal the record (or part of it). . . . [She] may not rubber stamp a stipulation to seal the record.") (citation omitted). This Court's Local Rules require that a party seeking to seal a document set forth "proposed reasons supported by specific factual representations to justify the sealing" and "an explanation why alternatives to sealing would not provide sufficient protection." Loc. R. 105.11 (D. Md. 2025). In support of its motion to seal, USCIS argues that the administrative record largely consists of sensitive information about A.A., including her full name, photographs of her, and her medical records. ECF 29, at 2. A.A.'s privacy interests are certainly weighty. However, USCIS has not adequately explained why redactions or another alternative to sealing the administrative record wholesale would be insufficient to protect those interests. USCIS simply states that because "the totality of the [administrative record] revolves around" Quarcoo's Form I-800, "almost the entirety of its supporting evidence" concerns A.A., and thus "the comprehensive and sensitive nature of [A.A.]'s records within the [administrative record] would reasonably make it possible to identify them despite redaction efforts." *Id.* at 2–3. But apart from being largely conclusory, this also is an overstatement. While there is substantial information about A.A. in the administrative record, there also is substantial information about Quarcoo and members of her family, along with other documents that USCIS does not argue are similarly sensitive. Redaction may be labor-intensive, but USCIS has not convinced the Court that redaction could not adequately protect A.A.'s privacy interests—especially since at least some information concerning A.A. in the administrative record overlaps with information in Quarcoo's public complaint and Quarcoo cites the administrative record throughout the motion for summary judgment that she already has filed, which is not under seal. The Court also is mindful that it will consider the administrative record in connection with the parties' motion(s) for summary judgment, and the public has a First Amendment right of access to documents submitted in connection with such motions. *See Doe v. Pub. Citizen*, 749 F.3d 246, 267 (4th Cir. 2014).

Accordingly, the Court will deny the motion to seal. The administrative record will be kept under seal for 30 days. Within that time frame, the parties shall meet and confer and propose redactions that are appropriately tailored to protect A.A.'s privacy and file a motion to seal with redacted and unredacted versions of the administrative record.

On February 2, 2026, USCIS filed a motion to dismiss Quarcoo's complaint for failure to state a claim, ECF 32, which is fully briefed, ECF 33 & 34. In its motion, USCIS argues that Quarcoo's claims are barred by the doctrine of consular nonreviewability and that, even if they are reviewable, the Court should dismiss them without examining the administrative record because Quarcoo essentially asks this Court to reweigh the evidence presented to USCIS, which courts cannot do.

On April 9, Quarcoo filed a motion for summary judgment. ECF 35. On April 14, the Court stayed briefing on the motion for summary judgment because the motion to dismiss was still pending, explaining that the applicability of the consular nonreviewability doctrine is a "threshold issue" that the Court must decide before considering Quarcoo's claims on their merits. ECF 37. Then, on April 21, the Court requested supplemental briefing on the applicability of the consular nonreviewability doctrine to Quarcoo's claims. ECF 38. The parties filed supplemental briefs on May 5 and May 12. ECF 39 & 40.

## II. Standard of Review

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive a motion to dismiss, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that a defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable, and the

pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the court must accept the allegations as true and "draw all reasonable inferences in favor of" the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022) (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). But the court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019)). The court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

The court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c). The court also may consider judicially noticed facts and documents integral to and explicitly relied on in the complaint when their authenticity is not disputed. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015); Fed. R. Evid. 201(b).

## III. Discussion

### A. The Consular Nonreviewability Doctrine Does Not Bar Quarcoo's Claims

USCIS argues that the Court should dismiss Quarcoo's claims because they are barred by the doctrine of consular nonreviewability. Quarcoo responds that the doctrine of consular nonreviewability does not apply because she does not challenge a consular official's decision to deny A.A. a visa; she challenges USCIS's decision to deny her a visa petition.[4]

Under the doctrine of consular nonreviewability, federal courts generally may not review a consular official's decision to deny a noncitizen a visa. *See Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024). The doctrine is grounded in the principle that "the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Id.* (quoting *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (internal quotation marks omitted)). "Accordingly, judicial deference is required where executive officials, such as . . . consular officer[s] . . . , possess expertise in matters falling outside judicial competency, including local conditions in foreign countries, diplomatic relationships and protocols, and national security needs." *Sesay v. United States*, 984 F.3d 312, 315 (4th Cir. 2021) (citing *Negusie v. Holder*, 555 U.S. 511, 517 (2009)). The consular nonreviewability doctrine does not implicate the Court's subject matter jurisdiction, *see Muñoz*, 602 U.S. at 908 n.4, and is properly raised in a motion to dismiss for failure to state a claim, *see Baan Rao Thai Rest. v.*

[4] A consular official is a "consular, diplomatic, or other officer or employee of the United States designated . . . for the purpose of issuing immigrant or nonimmigrant visas . . . ." 8 U.S.C. § 1101(a)(9).

*Pompeo*, 985 F.3d 1020, 1027 (D.C. Cir. 2021); *Teles de Menezes v. Rubio*, 156 F.4th 1, 9 (1st Cir. 2025).

The Supreme Court has "assumed" that there is a "narrow exception" to the consular nonreviewability doctrine "when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen." *Muñoz*, 602 U.S. at 908 (quoting *Hawaii*, 585 U.S. at 703). This exception, however—to the extent it exists—is tightly circumscribed: If "the Executive [gives] a 'facially legitimate and bona fide reason' for denying the visa," then the Court's "inquiry is at an end" and it cannot "look behind the exercise of that discretion." *Id.* (quoting *Kerry v. Din*, 576 U.S. 86, 103–04 (2015) (Kennedy, J., concurring in judgment)).

Quarcoo does not contend that the denial of her Form I-800 violated her constitutional rights. And she concedes that, if USCIS had provisionally approved her Form I-800 visa petition and a consular official had then denied A.A. a visa, the consular nonreviewability doctrine would bar this suit. ECF 40, at 8. But Quarcoo argues that the consular nonreviewability doctrine does not bar this suit because there is no "consular" decision for the Court to review. Before the State Department could get involved, the visa process was short-circuited when USCIS denied Quarcoo's visa petition, rendering it impossible for A.A. to ask a consular officer for a visa. As Quarcoo sees it, she is asking the Court to review a decision of *USCIS*, not a decision of a State Department consular officer, and for that reason, the consular nonreviewability doctrine does not bar her suit.

USCIS views things differently. To USCIS, the distinction Quarcoo draws is irrelevant. In USCIS's view, when USCIS approves or denies a Form I-800 visa petition, it is exercising "the sovereign power to make an exclusionary decision," which is what the consular nonreviewability doctrine insulates from judicial review. ECF 39, at 6. Though no consular official denied A.A. a

visa, that does not matter, USCIS argues, because "the doctrine of consular nonreviewability protects the visa adjudication process itself," not just decisions by State Department personnel. *Id.* at 9.

The Fourth Circuit has not spoken extensively on the consular nonreviewability doctrine, but it has provided some guidance. The Fourth Circuit's most recent (and most fulsome) treatment of the issue is its 2021 decision in *Sesay*.[5] In *Sesay*, the plaintiff, a U.S. citizen, challenged a consular official's denial of a visa to his daughter, who lived in Sierra Leone. 984 F.3d at 313–15. The district court dismissed the complaint under the consular nonreviewability doctrine, and the Fourth Circuit affirmed. *Id.* at 313. At the outset, the *Sesay* Court explained that the "well established" consular nonreviewability doctrine "instructs that ordinarily, 'it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien.'" *Id.* (quoting *United States ex rel.*

[5] The only other published Fourth Circuit opinions discussing the consular nonreviewability doctrine are *Int'l Refugee Assistance Proj. v. Trump*, 857 F.3d 554 (4th Cir.) (en banc) ("*IRAP I*"), *vacated as moot sub nom. Trump v. Int'l Refugee Assistance*, 583 U.S. 912 (2017), and *Int'l Refugee Assistance Proj. v. Trump*, 883 F.3d 233 (4th Cir.) (en banc) ("*IRAP II*"), *vacated*, 585 U.S. 1028 (2018). Even setting aside that both opinions have been vacated and therefore lack precedential value, *see Romero v. Bondi*, 150 F.4th 332, 340 (4th Cir. 2025), neither *IRAP I* nor *IRAP II* is particularly informative here. In *IRAP I*, the Fourth Circuit explained that consular nonreviewability does not bar "claims by United States citizens . . . and statutory claims that are accompanied by constitutional ones." 857 F.3d at 587 (quoting *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1163 (D.C. Cir. 1999)). But that observation does not shed much light on the appropriate course in this case, since Quarcoo does not bring any constitutional claims. In *IRAP II*, the doctrine of consular nonreviewability was discussed in the judges' separate writings, *see, e.g.*, 883 F.3d at 277–79 (Gregory, C.J., concurring); *id.* at 309 (Keenan, J., concurring); *id.* at 366–67 (Niemeyer, J., dissenting), but in the majority opinion, it was relegated to a footnote, *see id.* at 257 n.5. In that footnote, the Fourth Circuit observed only that the government had conceded that the doctrine did not bar review of a constitutional challenge to a presidential proclamation restricting the entry of foreign nationals from certain countries—a far cry from this case—and noted that courts have "a limited judicial responsibility under the Constitution even with respect to the power of Congress to regulate the admission and exclusion of aliens." *Id.* (alteration in original) (quoting *Fiallo v. Bell*, 430 U.S. 787, 793 n.5 (1977)). It falls to this Court to determine whether reviewing Quarcoo's claims is within the ambit of that "limited judicial responsibility." *Id.*

*Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). The court further explained that the doctrine reflects "[t]he primacy of the political branches over immigration policy" and the need for "judicial deference . . . where executive officials, such as the consular officer here, possess expertise in matters falling outside judicial competency, including local conditions in foreign countries, diplomatic relationships and protocols, and national security needs." *Id.* at 315 (citing *Negusie*, 555 U.S. at 517). "While these crucial principles may not be readily apparent or implicated in any particular visa determination," the court continued, "their cumulative importance to the conduct of foreign policy and exercise of diplomatic relations is large," and "[j]udicial respect for the rightful prerogatives of others is an essential piece of this national design." *Id.* at 316. Moreover, the *Sesay* Court explained, the doctrine is motivated by practical concerns: After all, "there are literally countless visa applications each year, and to thrust courts into the 'nuanced and difficult decision' that Congress has suitably situated amongst the executive's duties would mark no small change in our own role." *Id.* (quoting *Din*, 576 U.S. at 103 (Kennedy, J., concurring in judgment)).

The Supreme Court sounded a similar note in *Muñoz*, its most recent discussion of the consular nonreviewability doctrine. In that case, the Court considered whether the plaintiff—a U.S. citizen whose Salvadoran husband had been denied a visa—could show that she had a constitutional right to bring her spouse to the United States, such that she might satisfy the exception to consular nonreviewability for visa denials that infringe on U.S. citizens' constitutional rights. 602 U.S. at 903. The Court answered in the negative. In the process, it characterized consular nonreviewability as the "principle" that "the federal courts cannot review" "a consular officer's denial of a visa." 602 U.S. at 908. It traced this limitation on judicial review to the rule that, when Congress properly delegates its "discretionary authority to admit noncitizens" to "executive officials," those officials' decisions "'to admit or to exclude an alien' '[are] final and

conclusive.'" *Id.* at 907–08 (quoting *Knauff*, 338 U.S. at 543). And it explained that the Court's cases have long "recognized that the admission and exclusion of foreign nationals" is a "fundamental sovereign attribute" to be "exercised by the Government's political departments largely immune from judicial control." *Id.* at 907 (quoting *Hawaii*, 585 U.S. at 702).

Neither *Sesay* nor *Muñoz* considered whether USCIS's denial of a visa petition—as opposed to a consular official's denial of a visa after a visa petition is preliminarily approved by USCIS—is covered by the doctrine of consular nonreviewability. Nevertheless, the Court derives two key insights from these cases. First, its name notwithstanding, "consular" nonreviewability does not appear to insulate *exclusively* the actions of consular officials from judicial review. Neither *Sesay* nor *Muñoz* strictly cabined the doctrine to particular executive officials; rather, each described the doctrine as safeguarding the prerogatives of the executive branch as a whole. *See Sesay*, 984 F.3d at 316 (explaining that the doctrine shields the "'nuanced and difficult decision' that Congress has suitably situated amongst the *executive's* duties") (emphasis added) (quoting *Din*, 576 U.S. at 103 (Kennedy, J., concurring in judgment)); *Muñoz*, 602 U.S. at 907 (consular nonreviewability reflects principle that "the Government's *political departments*" have largely unreviewable authority over admission and exclusion of foreigners) (emphasis added) (quoting *Hawaii*, 585 U.S. at 702). The Court therefore cannot dispose of USCIS's consular nonreviewability argument simply because Quarcoo challenges a decision made by USCIS, rather than by a consular official.

Nevertheless—and this is the second insight—it still appears to matter, at least under Fourth Circuit law, whether a *consular* official has made a visa decision. As the *Sesay* Court explained, the consular nonreviewability doctrine is designed to ensure that courts do not usurp the judgment of executive officials who have expertise in areas such as diplomacy and country

conditions that are beyond judicial competence. And consular officers, the *Sesay* Court explained, are precisely such officials. *See Sesay*, 984 F.3d at 315. When a consular officer makes a judgment call on whether to grant a noncitizen a visa, she draws on a wealth of experience and country- or region-specific knowledge that Article III judges lack. The language of *Sesay* indicates that the purpose of consular nonreviewability is to shield *those* decisions—i.e., the nuanced, sensitive, and informed decisions that consular officers make when adjudicating visa applications—from judicial review.

At first blush, these insights appear to be in some tension. If consular nonreviewability is designed to protect consular officers' discretionary decisionmaking but does not apply *just* to consular decisions, what sorts of non-consular decisions does it shield from review? The Fourth Circuit has not answered this question, but out-of-circuit decisions provide guidance. In *Matushkina v. Nielsen*, for instance, Elena Matushkina, a Russian citizen, was denied an immigrant visa by the U.S. Consulate because a Customs and Border Protection ("CBP") officer had determined several years earlier that she was ineligible for a nonimmigrant visitor's visa. 877 F.3d 289, 291 (7th Cir. 2017). After her immigrant visa application was denied, Matushkina and her U.S. citizen daughter sued. But instead of challenging the visa denial itself—a challenge that would have been doomed under the consular nonreviewability doctrine—the plaintiffs tried a workaround. They sued DHS and the Chicago Area Port Director of the CBP, challenging the years-old nonimmigrant visa inadmissibility determination on which the consular official had relied to deny Matushkina's immigrant visa application. *Id.* at 292. The U.S. Court of Appeals for the Seventh Circuit disallowed that maneuver, reasoning that even though the plaintiffs had not directly challenged the consular official's decision, they were nonetheless waging an "indirect attack on the visa denial." *Id.* at 295. The plaintiffs sought to undermine an adverse consular

decision by asking a federal court to invalidate the decision of another executive branch actor—the CBP officer—on which the consular officer had relied in denying Matushkina a visa. Thus, their claims were barred by the doctrine of consular nonreviewability, just as though they had challenged the visa denial outright.

Other courts also have held that the consular nonreviewability doctrine insulates decisions made by executive branch officials who are functionally the equivalent of consular officers, even if they do not work for the State Department. For example, in *Doan v. INS*, the U.S. Court of Appeals for the Eighth Circuit concluded that the decision of an Immigration and Naturalization Service ("INS") "District Director" to deny a Vietnamese woman's application for a waiver of excludability was unreviewable. 160 F.3d 508, 509 (8th Cir. 1998). The court reasoned that, while "the position of INS District Director [was] distinct from that of a State Department consular official," the District Director was "the functional equivalent of a consular official, because he [was] an Executive Branch official, located outside the United States, deciding questions of admissibility brought before him by aliens who are also located outside the United States." *Id.* Thus, his decision whether to exclude a noncitizen enjoyed the same protection as would a consular officer's.

Neither example perfectly fits this case. Unlike the plaintiffs in *Matushkina*, Quarcoo is not challenging a finding that underpins a consular decision. And unlike *Doan*, this Court cannot conclude that the USCIS officials who adjudicate Forms I-800 are the equivalent of, or tantamount to, consular officers. To draw that conclusion would ignore the basic design of the Hague Convention visa framework, which assigns USCIS and State Department officials distinct roles: The former determine preliminary questions of visa eligibility and the latter determine whether to

grant visas to those who qualify.[6] Further, unlike *Doan*, there is no suggestion that the USCIS officials who denied Quarcoo's Form I-800 make admissibility determinations from posts outside the United States.

There is, however, some caselaw to support the proposition that USCIS denials of visa petitions are insulated by consular nonreviewability. In *Chiang v. Skeirik*, a U.S. citizen, Wen Chiang, sought a visa for his fiancée to come to the United States from China. 582 F.3d 238, 239 (1st Cir. 2009), *abrogated on other grounds by Teles de Menezes*, 156 F.4th at 9. USCIS initially approved Chiang's petition, but when a consular official interviewed his fiancée in China, her visa application was denied; then, Chiang's petition was "returned to USCIS for review." *Id.* at 239–40. USCIS then denied the petition on a different ground than that relied upon by the consulate to deny the fiancée's visa application. *Id.* at 240–41. The United States Court of Appeals for the First Circuit concluded that USCIS's denial of the petition—after the consulate had denied the visa application—was unreviewable under the doctrine of consular nonreviewability. *Id.* at 242.

On its face, *Chiang* would seem to counsel in favor of applying the doctrine of consular nonreviewability to Quarcoo's claims because Quarcoo, like the plaintiff in *Chiang*, challenges the denial of a visa petition. But the Court is hesitant to rely on *Chiang*. For one thing, *Chiang*'s holding appears to have rested on a remarkably capacious understanding of the consular nonreviewability doctrine. *Chiang* defined consular nonreviewability as the principle that "*in*

---

[6] USCIS argues in its supplemental brief that 6 U.S.C. § 236(f) "equat[es] 'a consular officer' with any "other United States official or employee" and that "in accordance with" that statute, the Court should "equat[e] a USCIS officer with a consular officer." ECF 39, at 9. That argument finds no support in the statutory text. Section 236(f) states: "Nothing in this section shall be construed to create or authorize a private right of action to challenge a decision of a consular officer or other United States official or employee to grant or deny a visa." Section 236(f) does not even mention USCIS officers, let alone suggest that they are tantamount to consular officers at all times and for all purposes.

*immigration disputes* nonconstitutional issues are generally outside the jurisdiction of the courts." *Id.* at 242 (emphasis added). From that premise, it naturally follows that the denial of a visa petition is unreviewable; after all, a challenge to such a denial is an "immigration dispute." But if that were truly the rule, then entire swathes of executive and legislative decisions related to noncitizens would be beyond the reach of judicial review. What's more, neither of the cases the First Circuit cited to support that sweeping proposition actually supports it. Rather, they simply reaffirm the uncontroversial, and more limited, proposition that consular nonreviewability shields decisions made by consular officers—not any and all "immigration disputes"—from review. *See id.* at 242 n.6 (citing *Adams v. Baker*, 909 F.2d 643, 649 (1st Cir. 1990) ("[F]actual determinations made by consular officers in the visa issuance process are not subject to review by the Secretary of State."), and *Saavedra Bruno*, 197 F.3d at 1159–60 ("The doctrine [of consular nonreviewability] holds that a consular official's decision to issue or withhold a visa is not subject to judicial review, at least unless Congress says otherwise.")). *Chiang*'s application of the consular nonreviewability doctrine therefore appears to rest on an inaccurate understanding of the scope of judicial review in immigration matters.

Moreover, the First Circuit has since indicated that, notwithstanding *Chiang*'s sweeping language, whether a *consular* official has acted impacts the consular nonreviewability analysis. In *Teles de Menezes v. Rubio*, a more recent decision, the First Circuit *declined* to apply consular nonreviewability to a challenge to the State Department's reclassification of a visa petition, which had delayed the adjudication of the plaintiff's visa application. 156 F.4th at 9–11. In reaching its decision, the First Circuit distinguished *Chiang* on two grounds. First, while the court acknowledged that *Chiang* "did apply the doctrine of consular [non]reviewability to bar a challenge to the denial of a visa petition," it reasoned that in *Chiang* "the denial marked the end of

the visa process for that beneficiary's visa application"; whereas in *Teles de Menezes*, the challenged State Department decision simply *delayed* the visa process. *Id.* at 10–11. Second, the court explained that "the denial of the petition [in *Chiang*] followed the denial of the visa application by a consular officer," which was not true in the case before it; no consular official had adjudicated the plaintiff's visa application yet. *Id.* As the First Circuit clarified in *Teles de Menezes*, the fact that USCIS denied the visa petition after a consular official's decision on a visa application was relevant to the consular nonreviewability analysis in *Chiang*.

So, even if the Court were persuaded by *Chiang*'s reasoning, *Chiang* would not clearly dictate the result here. Quarcoo's case occupies a twilight zone that *Chiang* did not consider. As in *Chiang*, the decision Quarcoo challenges—the denial of her Form I-800 petition—"marked the end of the visa process" for A.A. *Id.* at 11. But unlike in *Chiang*, no consular officer has denied A.A.'s visa application. *Chiang* does not provide clear guidance on whether consular nonreviewability applies in this case.

The Supreme Court and Fourth Circuit law on consular nonreviewability indicates that the doctrine shields some non-consular decisions from review. But *Sesay* in particular teaches that the doctrine is designed to protect the sensitive, discretionary judgment calls of executive officials like consular officers who bring their expertise in foreign affairs and national security matters to bear in deciding visa applications. So, the Court must decide whether, in adjudicating Quarcoo's APA claims, it would intrude on that delicate exercise of judgment.

It would not. By denying Quarcoo's Form I-800 visa petition, USCIS terminated the visa process before the State Department got involved. Even if she wanted to, Quarcoo could not ask this Court to review or undermine a consular officer's decision to deny A.A. a visa because Quarcoo cannot challenge, and this Court cannot upset, a decision that does not exist. Moreover,

if Quarcoo ultimately prevails in this lawsuit and this Court determines that USCIS acted arbitrarily and capriciously in denying her Form I-800, that decision would not restrict the discretion afforded the State Department to deny A.A. a visa for a facially legitimate and bona fide reason. *See, e.g.*, *Coniglio v. Garland*, 556 F. Supp. 3d 187, 202 (E.D.N.Y. 2021) (challenge to USCIS's revocation of visa petition was not barred by consular nonreviewability because "[a] ruling for [the plaintiffs] would have no binding effect on [the State Department], which remains free to refuse . . . a visa on any basis whatsoever, including one inconsistent with the terms of this Order").

Indeed, the Seventh Circuit in *Matushkina*—a decision on which USCIS relies—strongly signaled that consular nonreviewability would not apply in a case like this. 877 F.3d at 291. Recall that in that case, the Seventh Circuit concluded that consular nonreviewability barred a challenge to a years-old CBP determination that was the basis of Matushkina's visa denial. Pushing back, Matushkina pointed to *Maramjaya v. USCIS*, No. 06-2158 (RCL), 2008 WL 9398947 (D.D.C. Mar. 26, 2008), an unreported decision of the U.S. District Court for the District of Columbia that held that consular nonreviewability did not bar a challenge to the denial of a visa petition. Notably, the Seventh Circuit did not disagree with *Maramjaya*'s holding or dismiss the case as an outlier. Instead, the court distinguished it, reasoning that *Maramjaya* "simply did not involve a visa denial"; thus, unlike in Matushkina's case, "[t]here was not even the possibility of using the procedural attack on the denial of the [visa petition] as a back door to challenge a visa denial." *Matushkina*, 877 F.3d at 296. The same is true here. Quarcoo cannot use this lawsuit to collaterally attack a visa denial because a visa denial has not yet occurred. Just as in *Matushkina*, this fact matters to the consular nonreviewability analysis.

Perhaps the analysis would be different if the USCIS officials responsible for adjudicating Forms I-800 had the same expertise in "matters falling outside judicial competency"—such as "local conditions in foreign countries, diplomatic relationships and protocols, and national security needs"—as their State Department counterparts. *See Sesay*, 984 F.3d at 315 (explaining that consular nonreviewability is designed to afford "judicial deference" to decisions informed by such expertise). But USCIS (despite citing *Sesay* throughout its briefing) has not suggested that this is so. Indeed, cases discussing USCIS's expertise largely refer to its expertise in tasks like adjudicating naturalization applications, *see, e.g.*, *Al-Maleki v. Holder*, 558 F.3d 1200, 1210 (10th Cir. 2009); *Martinez v. Sec'y, Dep't of Homeland Sec.*, 670 F. Supp. 2d 1325, 1328 (M.D. Fla. 2009), or interpreting and applying the immigration laws, *see, e.g.*, *Bodhankar v. USCIS*, No. 1:19-CV-706 (MAD/CFH), 2020 WL 777211, at *3 n.1 (N.D.N.Y. Feb. 18, 2020); *Gil v. Crawford*, No. 1:15-cv-1633-MCE-MJS, 2016 WL 880952, at *1 (E.D. Cal. Mar. 8, 2016). Such tasks may be technical and specialized, but they are not "outside judicial competency." *See* 8 U.S.C. § 1421(c) (authorizing de novo judicial review of denials of naturalization applications); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01 (2024) ("[A]gencies have no special competence in resolving statutory ambiguities. Courts do."). In reviewing USCIS's decision on Quarcoo's Form I-800, the Court will not be stepping out of its lane.

In sum, Quarcoo does not challenge or collaterally attack a consular decision. She does not ask the Court to wade into sensitive matters of foreign policy or national security that are beyond its competence. Nothing the Court decides—if it decides in Quarcoo's favor—will preclude the State Department from denying A.A. a visa for a facially legitimate and bona fide reason. All

Quarcoo wants is to get A.A.'s visa petition before the State Department. The doctrine of consular nonreviewability does not foreclose that modest request.[7]

Quarcoo's claims are not barred by the doctrine of consular nonreviewability.

**B. Quarcoo Has Stated a Claim**

USCIS insists that, even if the consular nonreviewability doctrine does not bar Quarcoo's claims, the Court still should dismiss them for failure to state a claim. In USCIS's view, it conducted a "careful and reasoned analysis of the totality of the record evidence" Quarcoo submitted in connection with her Form I-800, and Quarcoo merely asks the Court "to re-weigh the evidence and side with [her]," which the Court may not do. ECF 32, at 18–19. USCIS does not clarify in its briefing whether it challenges the sufficiency of only certain of Quarcoo's claims or

[7] Though their reasoning differs from this Court's in certain respects, several district courts likewise have concluded that consular nonreviewability does not bar challenges to USCIS's denial or revocation of a visa petition. *See, e.g.*, *Maramjaya*, 2008 WL 9398947, at *4; *Anameze v. Jaddou*, No. 1:24-CV-192 (MAD/PJE), 2025 WL 447742, at *10–12 (N.D.N.Y. Feb. 10, 2025); *Coniglio*, 556 F. Supp. 3d at 200–03.

USCIS contends that these decisions were not only wrongly decided but also are distinguishable because none addressed the process for adjudicating a Form I-800 petition—which, USCIS argues, is unique. In particular, USCIS argues that "contrary to the statutes considered in *Anameze* and *Coniglio*, the IAA and its implementing regulations[] create an integrated and interdependent, exclusive, process between USCIS and the [State Department] for Hague Convention adoptions, in which the provisional approval of a Form I-800 is a mandatory prerequisite for consular action, and USCIS and [the State Department's] roles are intertwined." ECF 39, at 8. But USCIS has not satisfactorily explained how the Form I-800 process is materially distinct from other kinds of visa petitions, despite having been given an opportunity to develop this argument in supplemental briefing. As Quarcoo correctly observes, USCIS also must approve other types of visa petitions before a consular officer may consider a visa application; thus, the fact that USCIS approval "is a mandatory prerequisite for consular action" does not render the Form I-800 process unique. *See, e.g.*, *Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 47–50 (2014) (plurality opinion) (describing petition and application process for family-based immigrant visas). USCIS also points out that "USCIS approval of a Form I-800 petition is merely *provisional*" and that "[the State Department] must issue the final petition approval in order to issue the immigrant visa," and USCIS further observes that the issuance of Hague Convention visas involves a "back and forth between foreign governments." ECF 39, at 5. But while these may be distinctive features of the Form I-800 process, USCIS has not convinced the Court that they are material to the applicability of consular nonreviewability in light of Fourth Circuit and Supreme Court precedent.

all of them. At one point in its argument, USCIS argues that the Court should dismiss "the complaint," ECF 32, at 19, but then at another point, it argues that the Court should dismiss "Count IV," *id.* at 17, even though Quarcoo's complaint contains only three counts. And in the section heading of its motion to dismiss introducing its argument, USCIS states that "the Court cannot grant Quarcoo relief on her claim that USCIS misapplied the preponderance of the evidence standard," *id.* (capitalization altered), which suggests that USCIS means to challenge Count III, the only count of Quarcoo's complaint that mentions this standard, *see* ECF 1, ¶¶ 137–38. Nevertheless, the Court will assume that USCIS means to challenge the sufficiency of every APA claim that Quarcoo asserts.

The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency has acted arbitrarily and capriciously if it "has relied on factors which Congress has not intended it to consider" or if it has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)). "[S]o long as the agency provides an explanation of its decision that includes a rational connection between the facts found and the choice made, its decision should be sustained." *Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*, 991 F.3d 577, 583 (4th Cir. 2021) (quoting *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014)). Though "[t]his standard is 'highly deferential, with the presumption in favor of finding the agency

action valid,'" it is not "a 'rubber stamp.'" *Id.* (quoting *Ohio Valley Env't Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)).

The Court declines to dismiss Quarcoo's APA claims at this stage. "In recognition of the dangers associated with proceeding with judicial review on the basis of a partial and truncated record," when the Court must consider "whether the agency has adhered to the standards of decisionmaking required by the APA . . . the better practice is to test the parties' arguments in the context of a motion for summary judgment and with reference to the full administrative record," rather than through a motion to dismiss for failure to state a claim. *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 795–96 (D. Md. 2020) (internal quotation marks omitted) (quoting *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 112–13 (D.D.C. 2011)). "Consistent with this guidance, courts routinely exercise their discretion to decline to reach the ultimate question of whether the agency's decisionmaking process was arbitrary or capricious in the absence of the full administrative record." *Id.* at 796 (quoting *Banner Health*, 797 F. Supp. 2d at 113).[8]

Here, the Court has received the administrative record from USCIS (unlike the court in *City of Columbus*, *see id.* at 795). And the Court might be able to consider the administrative record in ruling on USCIS's motion to dismiss, even though courts generally may not consider matters outside the pleadings on a 12(b)(6) motion. *See, e.g.*, *Wang v. Noem*, 793 F. Supp. 3d 1231, 1235 (C.D. Cal. 2025) ("[W]hen faced with a motion to dismiss in the APA context, a court may consider the administrative record and public documents without converting the motion into a motion for

---

[8] There are exceptions to this rule when, for instance, "the parties' arguments can be resolved with reference to nothing more than the relevant statute and its legislative history," *see City of Columbus*, 453 F. Supp. 3d at 795 (quoting *Banner Health*, 797 F. Supp. 2d at 112)), or when a party presents purely legal contrary-to-law claims divorced from arbitrary-and-capricious claims, *see id.* at 799–800. Neither is the case here. All three counts of Quarcoo's complaint challenge USCIS's actions as arbitrary, capricious, *and* contrary to law, and neither party argues that the Court can resolve her claims by merely consulting a statute and its legislative history.

summary judgment.") (quoting *California v. Ross*, 362 F. Supp. 3d 727, 735 (N.D. Cal. 2018)). *But see also Am. Fed. of Gov't Emps., AFL-CIO, Loc. 3669 v. Shinseki*, 821 F. Supp. 2d 337, 345 (D.D.C. 2011) (explaining that while "a district court considering a Rule 12(b)(6) motion '*can* consult the [administrative] record to answer the legal question[s] before the court,' . . . '[i]t is probably the better practice for a district court always to convert to summary judgment'") (alterations in original) (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 & n.5 (D.C. Cir. 1993)). But even if the Court were inclined to wade into the administrative record to assess the plausibility of Quarcoo's claims on a motion to dismiss, USCIS has not given the Court enough to go on. Indeed, USCIS asks the Court to dismiss Quarcoo's claims without even looking at the administrative record, *see, e.g.*, ECF 32, at 17 (stating that the Court "must conclude" that Quarcoo fails to state a claim "without even reviewing the record"), and USCIS does not support its arguments with any citations to the administrative record. The Court cannot properly evaluate whether Quarcoo's claims are viable on such scant briefing and without any citations to the administrative record. The Court will decide the merits of Quarcoo's claims after the parties have fully briefed summary judgment motions.

The motion to dismiss for failure to state a claim is denied.

## IV. Conclusion

USCIS's motion to seal and motion to dismiss are denied. A separate Order follows.

Date: August 25, 2026

Deborah L. Boardman
United States District Judge